# BURLINGTON TRUCK LINES, INC., ET AL. *v.* UNITED STATES ET AL.

No. 27.   Argued October 15–16, 1962.—Decided December 3, 1962.*

---

*Together with No. 28, *General Drivers & Helpers Union, Local 554, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America,* v. *United States et al.,* also on appeal from the same Court.

*David Axelrod* argued the cause for appellants in No. 27. With him on the briefs were *Jack Goodman, Carl L. Steiner, Russell B. James, Starr Thomas* and *Roland J. Lehman.*

*David D. Weinberg* argued the cause and filed briefs for appellant in No. 28.

*Robert W. Ginanne* argued the cause for the United States et al., appellees. With him on the brief were *Solicitor General Cox, Assistant Attorney General Loevinger, J. William Doolittle, Robert B. Hummel, Elliott H. Moyer* and *I. K. Hay.*

*J. Max Harding* argued the cause for Nebraska Short Line Carriers, Inc., appellee. With him on the brief was *Robert A. Nelson.*

Mr. Justice White delivered the opinion of the Court.

These are direct appeals under 28 U. S. C. § 1253 from the judgment of a three-judge District Court, 194 F. Supp. 31 (S. D. Ill.), which upheld an order of the Interstate Commerce Commission, 79 M. C. C. 599, granting a motor common carrier application. This Court noted probable jurisdiction because of important questions raised as to the relationship and interplay between remedies available under the Interstate Commerce Act and under the National Labor Relations Act, as amended by the Labor Management Relations Act. 368 U. S. 951.

Appellee Nebraska Short Line Carriers, Inc., is a Nebraska corporation, organized in June 1956. All of its stock is owned by 12 motor carriers serving eastern and central Nebraska and interchanging interstate traffic at

Omaha and other gateway points with over 20 larger trunk-line carriers, among whom are the appellant carriers, with whom through-route, joint-rate, interline arrangements have been established. Some of the stockholder carriers serve Nebraska communities without other motor carrier or rail service.

For some time prior to May 1956, the stockholder carriers had resisted efforts by the Teamsters Union to unionize their operations. Eventually, the union sought to bring economic pressure to bear upon the stockholder carriers by a secondary boycott against their traffic through the larger, unionized, trunk-line carriers upon whom the stockholder carriers were dependent for interchanging traffic to and from points beyond Nebraska. The collective bargaining contract between the trunk-line carriers and the union contained protection of rights or so-called "hot cargo" clauses which reserved to the union and its members "the right to refuse to handle goods from or to any firm or truck" involved in any controversy with the union and provided that it should not be a cause for discharge if an employee of the carrier refused to handle "unfair" goods.[1]

---

[1] The hot cargo clause provided, in pertinent part:

"It shall not be a violation of this Agreement and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this Agreement. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other Union; and reserve the right to refuse to accept freight from or to make pickups from, or deliveries to establishments where picket lines, strikes, walk-outs or lockouts exist.

"The term 'unfair goods' as used in this Article includes, but is not limited to, any goods or equipment transported, interchanged, handled, or used by any carrier, whether party to this Agreement or not, at any of whose terminals or places of business there is a con-

In May 1956, some of the stockholder carriers began experiencing difficulties in receiving and delivering freight from and to many of their normal and logical connections at Omaha and, to some extent, at Sioux City, Lincoln, and Grand Island. The difficulty consisted primarily of the refusal on the part of many of the larger carriers to accept interline traffic tendered to them by the stockholder carriers and the refusal to turn over to them inbound traffic routed over their lines or normally turned over to them for delivery to ultimate destinations in Nebraska. The stockholder carriers, shippers, and consignees thus experienced considerable delay, inconvenience, and unforeseen expense in the movement of traffic to and from interior Nebraska points. At the same time, however, some of the larger interlining carriers, particularly appellants Burlington Truck Lines, Inc., and Santa Fe Trail Transportation Company, generally maintained normal interline relationships with the stockholder carriers.

The stockholder carriers thereupon organized Short Line and on June 22, 1956, Short Line filed an application with the Interstate Commerce Commission for common carrier authority to transport commodities on a regularly scheduled basis between certain Nebraska and Iowa points and points in other States. A further application for

---

troversy between such carrier or its employees on the one hand, and a labor union on the other hand; and such goods or equipment shall continue to be 'unfair' while being transported, handled or used by interchanging or succeeding carriers, whether parties to this Agreement or not, until such controversy is settled.

.            .            .            .            .            .

"The insistence by any Employer that his employee[s] handle unfair goods or go through a picket line after they have elected not to, and if such refusal has been approved in writing by the responsible officials of the Central States Drivers Council, shall be sufficient cause for an immediate strike of all such Employer's operations without any need of the Union to go through the grievance procedure herein."

operating authority over irregular routes between Omaha and points in 32 different States was filed six months later. The applications were assigned to two different examiners, each of whom recommended that the application before him be denied. The Commission stated that "the pertinent facts are accurately and adequately stated" in the examiners' reports and adopted the statements as its own (79 M. C. C., at 605, 608), but it concluded that the first application should be granted in part.[2] The Commission found that although service in the area was satisfactory before May 1956, after that date the union-induced boycott of the stockholder carriers caused "a substantial disruption" and "serious inadequacies in the service available." 79 M. C. C., at 612, 613. Accordingly, it found that grant of Short Line's application was required by "the present and future public convenience and necessity." *Id.,* at 613. The Commission declared that it was not attempting to adjudicate a labor dispute or trench upon the jurisdiction of the National Labor Relations Board, and it conceded its lack of jurisdiction to look beyond the duties of carriers to the public under the terms of the Interstate Commerce Act. *Id.,* at 611. It strongly criticized the carrier appellants for yielding to union secondary boycott demands, however, and it declared that the carriers' failure to fulfill their duties as common carriers was particularly inexcusable since there had been no violence or imminent threats of danger to property or person. The Commission expressed the opinion that alleged "apprehensions of certain of the organized carriers that any opposition to the demands of the union would have resulted in reprisals against them" were "greatly exaggerated," and it noted that some of the interlining

---

[2] The grant was limited to an Omaha-Chicago and Omaha-Kansas City-St. Louis route, for traffic originating in or destined to Nebraska points. 79 M. C. C., at 606, 614. No appellate review has been sought for the denial of the second application.

carriers had successfully continued to deal with the stock-holder carriers, with at least one of them encountering no difficulties with its employees when it changed its policy and carried out its statutory duties as a common carrier and interlined with the Short Line carriers.[3] *Id.,* at 612.

Finally, the Commission considered the remedy appropriate to the situation. Short Line had applied for operating authority under § 207 (certificates of public convenience and necessity). As the Commission noted, the Act provides other means of correcting deficiencies of service. Section 204 (c) empowers the Commission to order carriers to comply with the transportation laws, and the Commission may act upon complaint or upon its own motion without complaint, in each case after notice and hearing, and sanctions are available to enforce its orders; [4] § 212 (a) empowers the Commission to suspend certificates for failure to comply with duties under the Act. The Commission proceeded to dispose of the remedy problem in the following manner:

> "We do not agree with those of the parties who insist that the procedure here adopted; namely, the filing of the instant applications under the provisions of section 207 of the act, is in any manner inappropriate. Regardless of the injection of the labor situation into the matter, the instant applications are based upon claimed deficiencies in the motor service

---

[3] Apparently, in some instances it was necessary to handle interlined traffic by officials or supervisory personnel when employees refused to touch it. See R. 82.

[4] See §§ 212 (a) (revocation), 222 (a) (fine), 222 (b) (injunction). That the inadequacy in service involved here was first brought to the Commission's attention by appellee's application for a certificate in no way, of course, limited the agency's power to invoke §§ 204 (c), 212, 222.

available to the shipping public of Nebraska. Where, as here, the existing carriers are shown to have so conducted their operations as to result in serious inadequacies in the service available to a large section of the public, one effective method of correcting the situation is by the granting of authority for sufficient additional service, and, in fact, we' are charged with the duty of procuring such additional facilities as may be necessary to carry out the purposes of the national transportation policy. The fact that other remedies are available, such as the suggested filing of complaints by the aggrieved carriers and shippers does not alter the situation or deprive any carrier of the right to follow the course here chosen." *Id.,* at 613.

The Commission therefore granted the application.[5]

The protesting carriers and the affected union sought judicial review before a three-judge District Court (28 U. S. C. §§ 1336, 1398, 2321–2325), which upheld the order as within the scope of the Commission's statutory

---

[5] In this connection the Commission noted that it had refused a grant in a similar case decided concurrently with the present application (*Galveston Truck Line Corporation Extension,* 79 M. C. C. 619). The Commission stated that the circumstances there were different because the labor difficulties which had led to Commission issuance of a cease-and-desist order against carrier obedience to hot cargo clauses (*Galveston Truck Line Corp.* v. *Ada Motor Lines, Inc.,* 73 M. C. C. 617; see note 17, *infra*) had "ceased to exist for some time prior to the hearing, whereas in the instant proceeding such difficulties were of more recent origin and were continuing to be experienced up to and including the time of the hearing." 79 M. C. C., at 613. But approximately 21 months intervened between the examiner's report and the Commission's order, and over two years between hearings and order. During at least 18 months of this time the case appears to have been argued to the Commission, remaining on the docket pending decision. See 73 M. C. C., at 617, n. 1.

authority, based on adequate findings, and supported by substantial evidence. 194 F. Supp. 31. The court reviewed the evidence and concluded that although there was "no doubt that their [the protesting carriers'] ability to perform service prior to May 195[6] was adequate," the record showed that union pressure made it inadequate thereafter. 194 F. Supp., at 45. The court recognized that a cease-and-desist order might have been utilized, but stated that additional certification was also a permissible remedy which was not made unavailable merely because the reason for inadequacy of service was that "existing carriers [were] subordinating their public service obligations to their collective bargaining agreements." *Id.*, at 54.

In regard to the choice of remedy, the court rejected the contention that the passage of the Labor-Management Reporting and Disclosure Act of 1959, which added § 8 (e) to the National Labor Relations Act, as amended by the Labor Management Relations Act, 73 Stat. 543, 29 U. S. C. (Supp. III) § 158 (e), some four months after the entry of the order, mooted the case by making the union activities in inducing the organized carriers to boycott the Short Line stockholder carriers illegal and therefore unlikely to be resumed. The District Court expressed doubts as to whether § 8 (e) "effectively outlaws 'hot cargo' clauses," and maintained that, even if it did, the Commission's order should still stand. *Id.*, at 58. To the union's contention that grant of a certificate here injected the Interstate Commerce Commission into the province of the National Labor Relations Board, or at least undercut to some extent the policies of § 7 of the National Labor Relations Act, the court replied that the union's failure to organize the employees of the Short Line carriers "effectively destroyed any jurisdiction of the National Labor Relations Board under the Act of its cre-

ation." *Id.,* at 59.[6]  The case is now before us on direct appeals from this judgment.

We have concluded that the judgment of the District Court must be reversed and the Commission's order set aside as an improvident exercise of its discretion.  The Commission found from the facts of record that the refusals to handle interchange traffic and to accept freight from certain shippers [7] caused a substantial disruption in motor service and serious inadequacies in the service available, despite the efforts of some of the larger trunk-line carriers to maintain normal interline relationships. There was ample evidence to support these findings and we do not disturb them.

The difficulty with the order arises in connection with the findings and conclusions relevant to the choice of remedy.  The assumption of the Commission was that the deficiencies of service made either of two remedies available—additional certification or entry of a cease-and-desist order—and that it had unlimited discretion to apply either remedy simply because either might be effective.  It is unmistakably clear from the opinion of the Commission and from the fact-findings it made or adopted,[8] that the disruption in service resulted solely from refusals to serve, which in turn arose from union pressure applied to obtain union objectives.  It is equally clear that absent union pressure there would have been no refusals to serve and that in such normal circumstances

---

[6] Compare *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 471–472.  But see National Labor Relations Act, §§ 2 (3), 9; Norris-LaGuardia Act, § 13 (c).

[7] There were findings that secondary boycotts were imposed not only against the stockholder carriers but against certain shippers who were engaged in their own labor disputes.

[8] The Commission adopted the statements of facts in both recommended reports.  79 M. C. C., at 605, 608.

the facilities and the services of the existing carriers were adequate.[9] Moreover, the trunk-line carriers were operating below capacity,[10] were in a position and anxious to transport additional traffic,[11] and had been enjoying the previously interlined traffic which the grant would divert to Short Line.[12] In this factual context we may put aside at the outset the authority which the appellees rely upon that holds that additional certification is the normal and permissible way to deal with generalized inadequacy in service. See, e. g., *Davidson Transfer Co.* v. *United States*, 42 F. Supp. 215, 219–220 (E. D. Pa.), aff'd, 317 U. S. 587.[13] When, as here, the particular deviations from an otherwise completely adequate service (which has economic need for the traffic) consist solely of illegal and discriminatory refusals to accept or deliver traffic from or to particular carriers or shippers, the powers of the Commission under §§ 204, 212, and 216 bear heavily on the propriety of § 207 relief. And in such a case the choice of the certification remedy may not be automatic;

[9] R. 87–89, 95.

[10] R. 54.

[11] *Ibid.*, R. 95.

[12] R. 68–69.

[13] And see *Atchison, T. & S. F. R. Co.* v. *Reddish,* 368 U. S. 81, 91, where the Court rejected the argument that complaint proceedings must be resorted to before additional operating authority could be had to replace a common carrier service inadequate for the shippers' particularized physical or economic needs. This case, like the many cases appellees cite in which the Commission granted through-route certification to overcome inadequacy of existing joint-line service (e. g., *Penn Ohio New York Exp. Corp. Ext.—N. Y.,* 27 M. C. C. 269; *Malone Freight Lines, Inc., Ext.—Textiles,* 61 M. C. C. 501; *Dallas & Mavis Fwdg. Co. Ext.—Mont.,* 64 M. C. C. 511; *Braswell Ext.—Calif.,* 68 M. C. C. 664; *Kenosha Corp. Ext.—Kenosha,* 72 M. C. C. 289), is clearly inapposite here, where there is nothing inherently wrong with the appellant carriers' service, either because of its particular nature or because of lack of capacity, infrequency of pickups, delays in delivery, or the like.

it must be rational and based upon conscious choice that in the circumstances the public interest in "adequate, economical, and efficient service" outbalances whatever public interest there is in protecting existing carriers' revenues in order to "foster sound economic conditions in transportation and among the several carriers" (National Transportation Policy, 49 U. S. C. preceding §§ 1, 301, 901, 1001),[14] and the other opposing interests.

There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act [15] will not permit us to accept such adjudicatory practice. See *Siegel Co.* v. *Federal Trade Comm'n,* 327 U. S. 608, 613–614. Expert discretion is the lifeblood of the administrative process, but "unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion." *New York* v. *United States,* 342 U. S. 882, 884 (dissenting opinion). "Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body." *Federal Communications Comm'n* v. *RCA Communications, Inc.,* 346 U. S. 86, 90. The Commission must exercise its discretion under § 207 (a) within the bounds expressed by the standard of "public convenience and necessity." Compare *id.,* at 91. And for the courts

---

[14] In this connection it should be noted that certification of Short Line would divert traffic both from delinquent trunk-line carriers and from carriers who did not violate their duties by acceding to the secondary boycott, *e. g.,* Burlington and Santa Fe. See 79 M. C. C., at 603.

[15] Section 8 (b), 5 U. S. C. § 1007 (b), provides that all decisions shall "include a statement of . . . findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record."

to determine whether the agency *has* done so, it must "disclose the basis of its order" and "give clear indication that it has exercised the discretion with which Congress has empowered it." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 197. The agency must make findings that support its decision, and those findings must be supported by substantial evidence. *Interstate Commerce Comm'n* v. *J–T Transport Co.,* 368 U. S. 81, 93; *United States* v. *Carolina Carriers Corp.,* 315 U. S. 475, 488–489; *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 511. Here the Commission made no findings specifically directed to the choice between two vastly different remedies with vastly different consequences to the carriers and the public. Nor did it articulate any rational connection between the facts found and the choice made. The Commission addressed itself neither to the possible shortcomings of § 204 procedures, to the advantages of certification, nor to the serious objections to the latter. As we shall presently show, these objections are particularly important in the present context and they should have been taken into account.

Appellants' position is and was that the refusals to serve could be terminated through complaint procedures and thus the need for additional service obviated. The Commission was, as indicated, unresponsive to these arguments in its order, deeming that the availability of the other remedy "[did] not alter the situation." This was error. Commission counsel now attempt to justify the Commission's "choice" of remedy on the ground that a cease-and-desist order would have been ineffective. The short answer to this attempted justification is that the Commission did not so find. *Securities & Exchange Comm'n* v. *Chenery Corp.,* 332 U. S. 194, 196. The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that

an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself:

> "[A] simple but fundamental rule of administrative law . . . is . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action . . . ." *Ibid.*

For the courts to substitute their or counsel's discretion for that of the Commission is incompatible with the orderly functioning of the process of judicial review. This is not to deprecate, but to vindicate (see *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 197), the administrative process, for the purpose of the rule is to avoid "propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency." 332 U. S., at 196.

The second and longer answer to the attempted justification is that there is not substantial evidence of record upon which to base a finding that a cease-and-desist order would have been ineffective. There was every indication at the time that a cease-and-desist order would render the deficiencies in service purely temporary phenomena and would thus be effective in promoting adequate, economical, and efficient service and in fostering sound economic conditions among the carriers affected.

It is said that attempted compliance by the unionized carriers might in some way "so aggravate their labor difficulties as to cause a complete cessation of operations." But this ignores the Commission's conclusion that carrier apprehensions of teamster reprisals were exaggerated and unwarranted. It further ignores the fact that, as the Commission was aware, the National Labor Relations Board

had ordered the union to cease boycotting any of the stock-holder carriers by appeals to the employees of any other carrier. *International Brotherhood of Teamsters, Local 554,* 116 N. L. R. B. 1891. To be sure, the Board had not ordered the union not to make appeals directly to the trunk-line carriers. The union was free to make such appeals, absent inducement of employees, and, as far as the labor laws and the collective agreement [16] were concerned, the employer was free to reject or accede to such requests. But it was precisely at this point that the *Sand Door* case (*Local 1976* v. *Labor Board,* 357 U. S. 93) recognized the power of the Commission to enter cease-and-desist orders against the carriers' violating the transportation law and their tariffs.[17] Thus, as the appellant union argues,[18] there was no reason to have assumed that the ordinary processes of the law [19] were incapable of remedying the situation.[20]

---

[16] See note 1, *supra,* setting forth the relevant provisions, under which the employees reserved the right to refuse to handle hot cargo, but under which the employer was left to his own devices. Cf. note 3, *supra.*

[17] The Court cited with approval the first *Galveston* case (*Galveston Truck Line Corp.* v. *Ada Motor Lines, Inc.,* 73 M. C. C. 617), in which the Commission entered a cease-and-desist order against carrier obedience to hot cargo clauses. 357 U. S., at 109–110.

[18] The union contends in its brief and we agree that the § 212 (a) complaint procedure, if followed by the stockholder carriers, "would have provided a more adequate remedy" at the time the case was before the Commission in 1956–1959.

[19] It is further contended, but we need not consider it here, that the efficacy of a cease-and-desist order is severely limited by the agency's self-imposed limitation against ordering carriers to cease from discriminatorily refusing to interline at joint rates. But cf. *Dixie Carriers, Inc.,* v. *United States,* 351 U. S. 56; *Interstate Commerce Comm'n* v. *Mechling,* 330 U. S. 567. The Commission did not find, nor could it have found on this record, that the protesting carriers were likely to refuse to interline with the stockholder carriers except at discriminatorily higher, combination rates.

But discussion of the effectiveness of cease-and-desist orders in terms of the June 1959 status of hot cargo arrangements is now largely academic: Congress added § 8 (e) to the Act four months after the Commission's decision in this case and over a year before the District Court sustained the Commission. Under this section Congress declared it to "be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void. . . ." In the absence of authoritative judicial interpretation of § 8 (e), however, the District Court was unwilling to attach any significance to the new law in the present case. In this the District Court erred. The plain words of the statute at the very least raised serious questions about the legality of direct union-employer agreements to boycott another employer. Not only would the delinquent interlining carriers in this case be subject to the injunctive and other processes of the National Labor Relations Board if their conduct violated

[20] We do not imply that service deficiencies of the kind found in this record could never justify the issuance of permanent operating authority. A totally different case might be presented if other remedial action by the Commission and the Board proved fruitless, hopelessly time-consuming, or otherwise inadequate to terminate the interruptions in service. Nor do we intend to pass upon the Commission's discretion under § 210a to provide temporary authority, pending determination of an application for authority or cease-and-desist order, or as an alternative to permanent authority to remedy service deficiencies of the kind present here. See *Pan-Atlantic S. S. Corp.* v. *Atlantic Coast Line R. Co.*, 353 U. S. 436.

§ 8 (e), but the unions themselves would be vulnerable [21] and the pressures which generated the refusals to serve might well be effectively removed. These intervening facts so changed the complexion of the case that (even putting aside the considerations discussed above) the reviewing equity court, in the exercise of its sound discretion, should not have affirmed the order, as it did, but should have vacated it and remanded it to the Commission for further consideration in the light of the changed conditions. See *Ford Motor Co.* v. *Labor Board,* 305 U. S. 364, 373–374; *Wabash R. Co.* v. *Public Serv. Comm'n,* 273 U. S. 126, 130–131; *Gulf, C. & S. F. R. Co.* v. *Dennis,* 224 U. S. 503, 506–509.[22]

Finally, although we do not wish to fetter the Commission's expert, discretionary powers by specifically prescribing that cease-and-desist order relief be granted (if, indeed, any relief is still needed) rather than additional certification, nevertheless the Commission should be particularly careful in its choice of remedy, and should have been particularly careful, because of the possible effects of its decision on the functioning of the national labor relations policy. The Commission acts in a most delicate area here, because whatever it does affirmatively (whether it grants a certificate or enters a cease-and-desist order) may have important consequences upon the collective bargaining processes between the union and the employer. The policies of the Interstate Commerce Act and the labor act necessarily must be accommodated, one to the other.

---

[21] For the view of the National Labor Relations Board, see *Amalgamated Lithographers of America (Ind.),* 130 N. L. R. B. 985; *Amalgamated Lithographers of America,* 130 N. L. R. B. 968, aff'd, 301 F. 2d 20 (C. A. 5th Cir.); *American Feed Co.,* 129 N. L. R. B. 321.

[22] This was, of course, the District Court's, and not the Commission's, error.

Writing before the 1959 amendments to the labor law, this Court said in the *Sand Door* case:

"But it is said that the Board is not enforcing the Interstate Commerce Act or interfering with the Commission's administration of that statute, but simply interpreting the prohibitions of its own statute in a way consistent with the carrier's obligations under the Interstate Commerce Act. Because of that Act a carrier cannot effectively consent not to handle the goods of a shipper. . . . But the fact that the carrier's consent is not effective to relieve him from certain obligations under the Interstate Commerce Act does not necessarily mean that it is ineffective for all purposes, nor should a determination under one statute be mechanically carried over in the interpretation of another statute involving significantly different considerations and legislative purposes." 357 U. S., at 110.

The Court concluded that although "common factors may emerge in the adjudication of these questions" under the two Acts by the two different agencies, nevertheless independent consideration and resolution were possible, the National Labor Relations Board directing itself to consideration of whether the employees violated their duties under § 8 (b) and the Interstate Commerce Commission directing its attention to whether the carrier "may have failed in his obligations under the Interstate Commerce Act."

Implicit in this analysis is a recognition that if either agency is not careful it may trench upon the other's jurisdiction, and, because of lack of expert competence, contravene the national policy as to transportation or labor relations. In such a context, choice of the sweeping relief of certification rather than the more precise and narrowly

drawn cease-and-desist order remedy was improvident, absent a compelling justification. And the fact that § 8 (e) of the Act now exposes the employer as well as the union to Labor Board injunctive processes only underlines the necessity for careful analysis in fashioning a remedy to terminate unlawful action by delinquent carriers. This is not to say that circumstances can never permit the Commission to authorize additional service to remedy refusals to serve, but the Commission must act with a discriminating awareness of the consequences of its action. It has not done so here.

The judgment of the District Court is reversed. The case is remanded to it with instructions to enter an order enjoining, annulling, and setting aside the order of the Interstate Commerce Commission, and remanding the case to the Commission for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK, concurring in part and dissenting in part.

I concur in the Court's judgment setting aside the Commission's order granting a permanent certificate to a new carrier to compete with existing carriers who but for temporary interruptions caused by lawful labor union activities would adequately meet the needs of commerce. I do not concur, however, in the remand to the Commission for further proceedings. Congress has vested power to regulate the employer-employee relationship in the National Labor Relations Board, not in the Interstate Commerce Commission, and I think the Commission's grant of a permanent certificate here, which stems wholly from temporary transportation delays owing to a labor dispute within the Labor Board's jurisdiction and which in effect punishes carriers for honoring their then lawful

collective bargaining contracts, amounts to an impermissible encroachment on that Board's domain. We are not called upon at this time to decide whether the Commission is wholly without power under any and all circumstances to grant temporary relief from a temporary stoppage of commerce in order to remedy acute emergency situations such, for illustration, as a shortage of food or supplies urgently needed in particular localities. It will be time enough to decide what are the powers of the Commission to meet such situations when they arise; it is conceded that they are not presented in this case.

Since it is my view that under the facts here the Commission has no power to grant a permanent certificate to a competitor, I see no reason to direct that this matter be referred back to the Commission for further proceedings. Such a remand assumes that there is some further action by way of a cease-and-desist order the Commission can or should take. My view is that the facts in this record provide no possible basis for permitting the Commission to order the carriers to cease and desist from carrying out their agreement with the unions. Nothing in the Interstate Commerce Act gives the Commission power to prohibit carriers or unions under the circumstances shown by this record from doing that which the Labor Act permits them to do. Moreover, as the Court points out, four months after the Commission's order Congress outlawed the kind of conduct which here interfered with transportation. Since Congress has, by this enactment, so clearly taken this matter in hand in a way that does not rely for enforcement on the Interstate Commerce Commission, the old Commission proceedings have all the earmarks of mootness, whether technically moot or not. If the union or the truck lines should hereafter violate this new law the Labor Board, backed by the courts, is vested with ample power to force both carriers and unions to obey that law.

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

The Interstate Commerce Commission has enough to do within its congressionally appointed field without stepping over into the field of labor regulation. The Commission should no more than a State\* invade regulatory territory Congress has preempted for agencies of its own choice.

Mr. Justice Clark, concurring in the result.

Four months after entry of the Commission's order Congress enacted § 8 (e) as an amendment to the National Labor Relations Act, 29 U. S. C. (Supp. III) § 158 (e). Since the language of that section raised serious questions as to the legality of the unions' "hot cargo" pressures, which in turn raised questions as to any continuation of the "substantial disruption" in service, it appears to me that the District Court should have vacated the order and remanded the case to the Commission for reconsideration in light of the likelihood of changed circumstances. The grant of permanent certification to a new carrier in an area where there are existing certifications is a drastic remedy to which resort should not be made except in the most compelling circumstances.

For this reason I concur in the Court's reversal and remand to the District Court. In view of the lapse of time and the fact that the conduct which caused the disruption of service has been outlawed† by Congress, however, it appears that the issue has been mooted, and the Commission may determine that further proceedings would serve no purpose.

---

\*Cf. *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959).

†Although the effectiveness of the § 8 (e) ban on "hot cargo" clauses may have been subject to doubt when the District Court adjudicated this case, subsequent cases tend to remove any such doubt. See, *e. g., Labor Board* v. *Local 294, International Brotherhood of Teamsters,* 298 F. 2d 105 (C. A. 2d Cir. 1961).

Mr. Justice Goldberg, with whom The Chief Justice, Mr. Justice Douglas, and Mr. Justice Brennan join, concurring.

I join in the opinion and add only a few words to state my conviction that the "discriminating awareness of the consequences of its action" required of the Commission by the opinion, inevitably must lead, if any relief is now warranted (which I doubt), to a rejection of the remedy of additional certification in favor of an appropriately limited cease-and-desist order.

As the matter was presented to the Commission and to the District Court, the additional certification, as the facts here plainly demonstrate, involved the Commission in intervention in the underlying labor dispute to a degree unduly trenching upon the Labor Board's jurisdiction and the rights and duties of the affected parties. Most certainly after the 1959 amendments to the labor law, the Commission, had the case then been remanded to it by the District Court as it should have been, could have entered a cease-and-desist order under which no conflict could or would have arisen between the I. C. C. and the N. L. R. B. in the respective exercise of their powers and in the discharge of their responsibilities. Such a cease-and-desist order should have been appropriately limited to requiring the carriers to provide service in a manner and to the extent compatible with their labor agreements and with both the carriers' and the union's rights and duties under federal labor law. That such an order would have been sufficient in practical effect is demonstrated by the fact that both Burlington and Santa Fe, parties to the hot cargo agreements, were able to carry out their duties under the Motor Carrier Act without creating any serious problems under their union agreements or under the National Labor Relations Act. This being so in the absence of a cease-and-desist order, it is difficult to understand why entry of such an order against the carriers would have been ineffective.