**STATE OF NEW YORK DEPARTMENT OF SOCIAL SERVICES, Plaintiff,**

v.

**Donna E. SHALALA, Secretary, and the Department of Health and Human Services, and Louis D. Enoff, Acting Commissioner, and the Social Security Administration, Defendants.**

No. 92 Civ. 7383(LLS).

United States District Court, S.D. New York.

April 6, 1994.

---

Charles A. Miller, Covington & Burling, Washington, DC, for plaintiff.

William J. Hoffman, Asst. U.S. Atty., S.D.N.Y., New York City, for defendants.

## MEMORANDUM AND ORDER

STANTON, District Judge.

Plaintiff State of New York Department of Social Services ("NYDSS" or the "State") seeks a declaratory judgment that it lawfully earned interest on funds that it received from the federal government for administering federal disability compensation programs, and an injunction barring defendants from disallowing its entitlement to those amounts. Both sides move pursuant to Fed.R.Civ.P. 56 for summary judgment. NYDSS also moves to supplement the administrative record.

## BACKGROUND

The costs incurred by NYDSS in administering disability compensation programs under the Social Security Act (the "Act"), 42 U.S.C. §§ 401 et seq. and §§ 1381 et seq., are paid by the federal government "in advance or by way of reimbursement." 42 U.S.C. § 421(e). The amount of employee fringe benefits available to NYDSS under this arrangement is determined by annual agreements between the New York State Comptroller and the federal Department of Health and Human Services (the "HHS") Division of Cost Allocation (the "DCA"). At issue in this action is the timing of the State's requests for those benefit funds and its use of interest-bearing accounts. The State seeks to prevent the Social Security Administration (the "SSA") from recovering interest earned between 1980 and 1987 on federal funds designated for the State Public Employees' Retirement System ("PERS").

In 1987, the federal Department of Health and Human Services' Departmental Appeals Board (the "Board") held that the State's procedures for drawing funds were improper, but that the SSA had produced insufficient evidence to establish the amount of interest earned by the State. After additional audits, however, the Board subsequently affirmed SSA disallowances totaling $2,610,015. The State challenges those disallowances here.

## DISCUSSION

### 1. Standard of Review

This court may set aside decisions of the Board only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) ("The court is not empowered to substitute its judgment for that of the agency."). Furthermore, an agency's interpretation of a statute that it is charged to administer should be followed " 'unless there are compelling indications that it is wrong.' " Weeks v. Quinlan, 838 F.2d 41, 43 (2d Cir.1988), quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).

### 2. Motion to Supplement the Record

NYDSS moves to supplement the administrative record with two agreements between the New York State Comptroller and the DCA dated 1984 and 1987. Defendants acknowledge that the agreements were the subject of attention throughout the administrative process, and have thoroughly briefed the relevant issues here. Since there is no unfair prejudice, the motion to supplement the record is granted. See Esch v. Yeutter, 876 F.2d 976, 991 (D.C.Cir.1989) (administra-

tive record may be supplemented "when an agency considered evidence which it failed to include in the record").

### 3. *The Disallowances*

■ The Board reasonably concluded that the State was required to time its cash advances from the federal government closely to its actual disbursements into PERS. The regulations do not permit the State to retain funds beyond immediate cash needs. *See* 31 C.F.R. § 205.4(a):

> Cash advances to a recipient organization shall be limited to the minimum amounts needed and shall be timed to be in accord only with the actual, immediate cash requirements of the recipient organization in carrying out the purpose of the approved program or project. The timing and amount of cash advances shall be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program costs and the proportionate share of any allowable indirect costs.[1]

The Board appropriately rejected the State's contention that it had complied with the regulations, finding that the "disbursements" occurred when funds were actually disbursed by the State, and not when the obligations accrued under the State's accounting system. It also reasonably concluded that interest earned by the State's premature acquisition of the funds constituted an "applicable credit," and therefore could not be retained. *See* 41 C.F.R. § 1–15.703–3(a) (1980–84) ("applicable credits" defined as "those receipts or reductions of expenditure-type transactions which offset or reduce expense items allocable to grants as direct or indirect costs"); § 1–15.703–1(g) (states are limited to reimbursement for necessary costs "net of all applicable credits"); *id.* § 1–15.701–1 ("No provision for profit or other increment above costs is intended."); OMB Circular A–87, 46 Fed.Reg. 9548 (1981) (same). *See also* Disability Insurance State Manual § 439.5:

> The holding of Federal cash in excess of current disbursement needs is contrary to

the objective of the letter of credit system and could result in cancellation of the letter of credit. When the objective is fully achieved in accordance with the instruction, there should be no Federal cash balances on which to earn interest. Any interest earned on funds advanced by the Social Security Administration must be credited on the SSA–874 as indicated in section 441.442, "line 4a, miscellaneous receipts."

■ The State argues that the SSA lacked the authority to challenge its placement of federal funds into interest-bearing accounts. Only the DCA, it argues, has the authority to monitor its use of funds for benefit costs. Applying HHS regulations that give the SSA jurisdiction over monitoring state compliance with the regulatory scheme, however, the Board concluded that the SSA had the authority to audit the State's practices and disallow the interest. *New York State Dep't of Social Services,* No. 90–198 (October 19, 1990), slip op. at 4–5 (Administrative Record ("AR") 24–25). In the absence of any statutory or regulatory provision establishing the DCA's exclusive jurisdiction over disputes of this kind, the Board's judgment regarding the internal division of responsibility within its own agency will be honored.

■ The State also argues that it was permitted to earn the interest under a 1984 agreement with the DCA. Throughout the early eighties, New York contributed to the New York State PERS fifteen months after the end of each fiscal year, and paid interest to PERS to reimburse it for the delay. The significance of the 1984 agreement was that it ended the State's practice of charging the federal government for those interest costs. The State no longer could pass the cost of its internal financial arrangements onto the federal government.

The State maintains that implicit in the 1984 agreement was the understanding that it could replace the disallowed funds with interest earnings on prematurely drawn-down funds. The 1984 agreement, however, is silent concerning the timing of requests for

---

1. The Board's interpretation of this regulation— that advances for both direct and indirect costs

must be timed closely to disbursements—is reasonable, and therefore will not be disturbed.

federal funds and whether the State could earn interest on them. The agreement, along with other agreements between the DCA and the State, established how much the federal government would pay for employee benefits: there is no evidence that interest earnings were ever factored into those rates. Nor is there any evidence that the issue of interest earnings was even raised during negotiations with the DCA.

The State relies heavily on the fact that DCA officials were aware of its delayed payments to PERS. *See* Letter from DCA to State Comptroller of October 1, 1986 at 1–2 (AR 555–56). There is no evidence, however, that the DCA authorized the State to place the federal funds into interest-bearing accounts and use the interest to compensate PERS for the delay in payments of which the federal scheme disapproves. The Board reasonably concluded:

> Moreover, even if DCA knew, as the State alleged, that the State was prematurely drawing down the retirement portion of its fringe benefit funds as part of its systematic drawdowns under the unified fringe benefit rate, DCA clearly did not authorize the investment of the funds in interest-bearing accounts or the retention by the State of any interest earned. Thus, DCA's knowledge, if any, of the premature drawdowns is irrelevant to the ultimate investment practices of the State that led to the disallowance and clearly cannot be viewed as a form of sanction or approval for those practices.

*New York State Dep't of Social Services,* Dec. 1186 (August 23, 1990), slip op. at 6 (AR 16) ("*New York II* ").

The State asserts that the disallowances were improper because it never profited from the interest earnings: "the proceeds of the draw-downs at issue were in fact applied to reimbursement of the State's costs incurred for services provided to the federal government." (Plaintiff's Memorandum of Law dated July 30, 1993 at 11). It claims that the earnings were contributed to PERS as inter-

est for the fifteen-month delay in payment. As explained above, interest payments to PERS were not considered by the HHS to be allowable costs. It was therefore improper for the State to use federal funds for that purpose. *See* 20 C.F.R. §§ 404.1626(d) ("The State may not incur or make expenditures for items of cost not approved by us or in excess of the amount we make available to the State.").[2]

■ The State also relies on the Intergovernmental Cooperation Act (the "ICA"), 31 U.S.C. § 6503(a) (1988), which provides that a state "is not accountable for interest earned on grant money pending its disbursement for program purposes." However, the ICA excludes from the definition of grant "a payment to a State or local government as complete reimbursement for costs incurred in paying benefits or providing services to persons entitled to them under a law of the United States." 31 U.S.C. § 6501(4)(C)(vii). In concluding that the ICA was no bar to the disallowances, the Board simply applied the plain language of the statute. The funding at issue here is complete reimbursement for the State's administration of federal disability programs, and therefore does not constitute a grant under the ICA.

### 4. *The Calculation of Interest*

■ The State argues that the SSA's interest calculations were arbitrary and capricious. Specifically, it claims that the use of compound interest was improper and that the computations did not reflect the fact that invested funds may have been withdrawn for other purposes before being applied to retirement contribution 15 months later. The only support for its position, however, is in the form of "estimated internal figures": at no point during the administrative process did the State produce any credible evidence to contradict the audits, even though such evidence, if it exists, is in the exclusive control of the State. The Board found that:

> The State has had ample opportunity to complete its own calculations and to supply

---

2. In any event, there is no evidence in the record to support the State's contention that it used the earnings to pay interest to PERS. Indeed, the State never asserted this position to the Board,

arguing first that it had never earned interest, and later that the interest earnings were used to satisfy other fringe benefit costs.

all of the necessary supporting evidence and has not done so. The interest question was raised initially during the pendency of *New York I*, where the State denied that it had in fact earned interest. *New York I*, pp. 4–5. The I.G. review that followed that decision concluded that the State had earned interest based in part on concessions by the State's Deputy Comptroller, Division of Investments and Cash Management, in a letter dated August 12, 1988. SSA Ex. 1. The Agency's subsequent disallowance, first at the regional level dated August 1, 1989 and then by the Deputy Commissioner for Programs, dated January 4, 1990, again raised this issue as the basis for a disallowance. Both appeals provided a forum for the state to provide an alternative computation.

*New York II* at 8–9 (AR 18–19).

In light of the SSA audits and the State's failure to produce evidence in rebuttal, the Board's decision to affirm the disallowances was reasonable. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (agency must show "a rational connection between the facts found and the choice made").

 The State also claims that under the doctrine of equitable recoupment it is entitled to offset the disallowances with the interest owed to it by the SSA. According to its counsel, the State made a series of "interest-free loans" to the SSA for various benefit costs. Under the doctrine of equitable recoupment

a defense that would be time-barred as a claim for affirmative relief may be used to reduce an adverse recovery where the defense establishes an equitable defect inhering in the adverse party's claim. The doctrine is founded in considerations of fairness; it would be highly inequitable to permit a party to place a question before a court and then prevent the opposing party from disputing issues lying at the foundation of the claim.

*118 East 60th Owners, Inc. v. Bonner Properties, Inc.*, 677 F.2d 200, 203 (2d Cir.1982). That is not the case here. As detailed above, the State declined the opportunity to produce credible alternative calculations at the administrative level. Because there is nothing in the record to substantiate the amount or even the existence of the so-called interest-free loans, the Board's failure to offset the disallowances could hardly be viewed as "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## CONCLUSION

Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted. The clerk of the court is directed to dismiss the complaint.

**So ordered.**