FRIEDMAN, Circuit Judge,
dissenting.
I would affirm the judgment of the Claims Court, but on a different ground than that court gave. In my view, the Secretary of Agriculture’s decision of April 12, 1985, was valid, and the Claims Court therefore erred in rejecting that decision in its decision of June 21, 1985.
1. On June 14, 1977, the Department of Agriculture published a proposed rule for a price support payment program for sugar cane and sugar beets. Under the rule, entitlement to support payments depended upon when the sugar was “marketed.”
In commenting on the rule, the appellants, who constitute the Hawaiian sugar industry, pointed out that the Hawaiian segment of the industry differed from the rest of the industry because the Hawaiian industry was vertically integrated. In Hawaii, the sugar cane growers, with minor exceptions, were also sugar processors. The growers had a cooperative arrangement in which they processed their sugar under the name of C & H. C & H, in turn, owned a large refining plant in California that was the sole marketing agent for the Hawaiian industry. C & H either (1) refined raw sugar and sold the refined product, or (2) sold the raw sugar directly to other refiners in the United States.
C & H noted that under the Hawaiian sugar industry’s marketing arrangements, the final return to the grower was directly tied to the price at which the refined or raw sugar was sold to third parties. In order to guarantee that the return to the grower plus payment under the price support program equalled 13.5 cents per pound, as the regulation required, C & H suggested that the definition of marketing under the program, as applied to the Hawaiian sugar industry, be clarified to provide that a marketing of sugar did not occur until C & H sold either the raw or the refined sugar to third parties. This suggestion was adopted in the final regulations for the payment program, which were promulgated on October 7, 1977. 7 C.F.R. § 1435.3(d) provided:
[W]here raw cane sugar processors market their sugar through a cooperatively-owned refinery, marketing shall not be deemed to have occurred until the raw sugar or refined sugar produced therefrom is marketed by the cooperative....
2. On September 29, 1977, Congress enacted an amendment to the Food and Agriculture Act of 1977, Pub.L. No. 95-113, § 902, 91 Stat. 949 (1977) (codified at 7 U.S.C. § 1446(f)), which required that the Department of Agriculture implement a loan program to support the price of sugar. The amendment provided that the 1977 and 1978 crops of sugar should “be supported through loans or purchases,” rather than payments. Under the loan program, processors were eligible for non-recourse loans at the rate of 13.5 cents per pound of raw sugar placed in storage as security for the loan. If, after eleven months, the market price of sugar did not rise above 13.5 cents per pound, a processor could default on the loan. Thus, the government would in effect have bought the sugar at 13.5 cents per pound. On the other hand, if the market price rose above 13.5 cents per pound, the processor had the opportunity to redeem the sugar and sell it at the higher market price.
3. At the time the price support programs were implemented, C & H and the integrated processor refiners in Louisiana (IPRs) could qualify for the loan program because they had sugar physically available to them to place under loan. Both C & H and the IPRs, however, would have had to divert raw sugar from their refineries or import foreign raw sugar in order to utilize the loan program. Thus, the two entities were similarly situated with regard to the “economic availability” of the loan program.
C & H and the IPRs were not similarly situated, however, with regard to the knowledge they had regarding their qualification to participate in the loan program. Although the program regulations addressed the marketing situation of C & H, they did not deal with the special situation *636 of the IPRs. The regulations covered marketing by a cooperative or through a formal contract. See 7 C.F.R. § 1435.3(d). Unlike C & H, the IPRs purchased most of their sugar cane from independent growers. They then processed it into raw sugar and refined it for sale.
Since the IPRs neither sold any raw sugar nor entered into formal contracts for the sale of the raw sugar they produced to their refineries, the IPRs were unsure when their sugar would be considered marketed and thus qualified for price supports. The IPRs discussed the problem with the Department of Agriculture. Department officials informed them that their sugar should be considered marketed when the raw sugar was transferred to the refinery. Although the Department’s advice later turned out to be erroneous, the IPRs relied on this advice in good faith.
In contrast, the regulations (as the result of the change made in response to C & H’s earlier comments on the payment program) specified the standards for determining when C & H’s sugar was marketed, namely, when C & H sold either the raw sugar or the refined sugar it had produced therefrom. C & H made no attempt to obtain any changes in or interpretation of the loan program regulations to deal with any of its particular problems.
In reliance on informal advice received from the Department of Agriculture, the IPRs believed that all their 1977 sugar had qualified for the payment program. They therefore did not consider placement of their sugar under loan while they still had physical possession of the sugar. In contrast, C & H had suggested that the regulations applicable to them be adopted. They were therefore well aware throughout the operation of the loan program that certain of their sugar would not qualify for payment, but would have to be placed under loan if it was to receive price support.
4. In his April 12, 1985 decision, made in response to the Claims Court’s first remand in this case, the Secretary found that the IPRs and C & H were not similarly situated for purposes of the 1977 price support programs:
Due to a deficiency in the 1977 payment program regulations and the [IPRs’] reliance on advice given by program officials, the IPRs lacked the knowledge and information to avail themselves of the loan program. In contrast, C & H was fully apprised, by way of the terms of the regulations themselves, of exactly where the Hawaiian industry stood vis-a-vis the two 1977 price support programs.
5. In holding in its decision of June 21, 1985, that the Secretary had failed to justify the different treatment of C & H and the IPRs for purposes of the payment program, the Claims Court failed to give adequate recognition to the broad discretion the Secretary had in conducting and implementing the program and to the limited scope of judicial review of his decision made in the performance of that function. An agency determination is arbitrary and capricious only if the agency “entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Motor Vehicle Mfr. Ass’n v. State Farm Mut., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The court is not “empowered to substitute its judgment for that of the expert agency,” where the agency has articulated a “rational connection between the facts found and the choice made.” Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974); Burlington Truck Unes v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).
Although one might disagree with the Secretary’s conclusion, his decision was entitled to the deference customarily accorded to an expert agency’s decision made in connection with the performance of its function. I think that the Secretary articulated a rational basis for his decision to treat the IPRs and C & H differently.
As both parties concede, C & H could have participated in the loan program if it had chosen to do so. C & H had the option *637 of either diverting raw sugar from its refineries or of importing raw sugar. The loan program was thus fully available to C & H in the sense that raw sugar was physically available and C & H possessed the information and knowledge necessary to avail itself of the loan program. The question is whether the Secretary was required retroactively to supply C & H with price supports after C & H chose to use its sugar in its refineries rather than to participate in the loan program.
As the Secretary properly recognized, the economic availability of a commodity for placement under a loan program is generally not a relevant consideration in determining whether a price support has been made available to the given producer. See Secretary of Agriculture, Memorandum of Determination (April 11, 1985). While payment programs are frequently designed to ensure that a producer receives a specified price for a commodity when it is sold, the “essence of a loan program ... is that the producer must make an economic choice between serving his customer or placing the commodity under loan.” Id. Decisions about whether to participate in a loan program “are business decisions which fluctuate with each potential participant” in the program. Id.
As the court explained in Amalgamated Sugar Co. v. Bergland, Civil No. 75-1245 (D.Idaho), a case involving aspects of the price support programs for beet sugar processors not at issue here:
[T]he payment program and the loan program are completely different. Whereas a payment program is not intended to interfere with normal marketing activities of the processor, a loan program provides a minimum price for the product.
Since the payment program permitted processors to participate fully in the program without influencing their decisions in the market place, there were few, if any, impediments to a processor’s complete participation in that program. Participation in the loan program, however, was dependent on the willingness of the processor to forego normal marketing opportunities____

Id.

The court in Amalgamated Sugar recognized that the loan program did not require the Secretary to provide the same amount of price support to all participants, so long as the same level of price supports was “available” to all participants who chose to make the marketing decisions necessary to participate in the program.
As C & H admits, its decision not to participate in the loan program was “essentially a marketing decision.” Although C & H had the knowledge and the ability to participate fully in the loan program, C & H made an informed business decision to forego the benefits of this program. C & H cannot now complain that it is entitled to the price supports it deliberately rejected.
The court assumes that Congress intended to provide “price support for all sugar cane of the 1977 crop,” regardless of the marketing decisions of the potential participants in the loan program. The court relies on an item of the legislative history of 7 U.S.C. § 1446(f) stating that “a substantially equal level of price support [should] be provided for all sugar cane and sugar beets of the 1977 crop.” See H.R.Conf. Rep. No. 599, 95th Cong., 1st Sess. 174, reprinted in 1977 U.S.Code Cong. & Admin. News 1704, 2474. C & H, however, was “provided” with the opportunity to obtain an equal level of price supports as other producers by participating in the loan program, but chose not to do so. The Claims Court was not justified in rejecting the Secretary’s determination, as it did in its decision of June 21, 1985.