# United States Court of Appeals for the Federal Circuit

---

**BYRDIE A. TURMAN-KENT,**
*Petitioner,*

v.

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent.*

---

2011-3100

---

Petition for review of the Merit Systems Protection Board in AT0831040365-I-1.

---

Decided: September 9, 2011

---

BYRDIE A. TURMAN-KENT, of Evanston, Illinois, pro se.

SARA B. REARDEN, Attorney, Office of the General Counsel, Merit Systems Protection Board, of Washington, DC, for respondent. With her on the brief were JAMES M. EISENMANN, General Counsel and KEISHA DAWN BELL, Deputy General Counsel.

---

Before BRYSON, O'MALLEY, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* BRYSON.
Dissenting opinion filed by *Circuit Judge* REYNA.

BRYSON, *Circuit Judge.*

Petitioner Byrdie Turman-Kent seeks review of an order of the Merit Systems Protection Board dismissing her petition for review of the decision of an administrative judge on grounds of untimeliness. We affirm.

I

Ms. Turman-Kent married Jesse W. Kent in 2001. Mr. Kent had previously retired unmarried under the Civil Service Retirement System ("CSRS") and had elected to receive an annuity payable during his lifetime with no survivor benefits. Mr. Kent died in 2003, and Ms. Turman-Kent later applied to the Office of Personnel Management ("OPM") for survivor annuity benefits as Mr. Kent's widow. That request was denied because Mr. Kent had never elected to provide a survivor annuity for Ms. Turman-Kent.

Ms. Turman-Kent asked OPM to reconsider its decision based on a telephone conversation that she and her late husband allegedly had with an OPM employee regarding Mr. Kent's election of survivor annuity benefits. After considering that new evidence, OPM affirmed its determination that Ms. Turman-Kent was ineligible for survivor annuity benefits. In a January 2004 letter, OPM explained that a previously unmarried retiree such as Mr. Kent could have elected to receive a reduced lifetime annuity with survivor benefits for a new wife only by notifying OPM of his intentions in a signed writing within two years of his marriage. *See* 5 U.S.C. § 8339(k)(2)(A).

That letter also notified Ms. Turman-Kent of her right to appeal OPM's decision to the Board.

Ms. Turman-Kent filed an appeal with the Board contesting OPM's reconsideration decision. In May 2004, the administrative judge who was assigned to her case upheld OPM's decision. The administrative judge explained that Ms. Turman-Kent had provided the Board with no basis for waiving the two-year statutory time limit for election of survivor benefits. The administrative judge's initial decision was sent to Ms. Turman-Kent with the following notice:

> This initial decision will become final on ***June 21, 2004***, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. . . . These instructions are important because if you wish to file a petition, you must file it within the proper time period.

Ms. Turman-Kent did not file a petition for review by the Board before June 21, 2004, and the administrative judge's initial decision therefore became the final decision of the Board.

Ms. Turman-Kent ultimately filed a petition for review with the Board on August 11, 2010, more than six years after the initial decision became final. Upon receiving her petition, the clerk of the Board informed her that it was untimely filed and provided her with an opportunity to file a motion to accept the filing as timely or waive the time limit for good cause. In her motion, Ms. Turman-Kent alleged that she had long suffered from short-term

and long-term memory loss due to an intracerebral hemorrhage suffered in 1986. She also represented that her illness had "flare[d] out of control" after May 2004 due to extreme stress, but that her medical condition had "shifted" and "improved" at some time after mid-2006, when she moved to Illinois. Ms. Turman-Kent stated in her motion that her disability "made it difficult to find [her] records in order to accurately chronicle events necessary to respond in a timely manner." She attached a one-page letter from an Illinois physician, Dr. Jean Cavanaugh, who stated that she had examined Ms. Turman-Kent before she moved to Georgia in 2002 and again after July 2006 for cognitive defects attributable to her intracerebral hemorrhage. Dr. Cavanaugh described Ms. Turman-Kent's condition as "stable but a major impairment" since the late 1980s. Dr. Cavanaugh stated that "[t]here is no doubt in my mind that she was unable to process paper work after her husband's death."

After considering Ms. Turman-Kent's motion, the Board denied her petition for review as untimely filed. The Board found the statement of Dr. Cavanaugh insufficient to support Ms. Turman-Kent's claim because Dr. Cavanaugh had not examined Ms. Turman-Kent for several years during the six-year period of delay in filing her petition for review. The Board noted that Dr. Cavanaugh did not allege that she reviewed Ms. Turman-Kent's medical records for that time period, and it observed that Dr. Cavanaugh's statement post-dated the filing of Ms. Turman-Kent's petition for review. Finding no credible medical evidence regarding Ms. Turman-Kent's condition between June 2004 and July 2006, the Board determined that Ms. Turman-Kent "ha[d] not submitted sufficient evidence to support that her medical condition impaired her ability to timely file her petition for review, or to request an extension of time."

II

Ms. Turman-Kent bears a "heavy burden" to overturn the Board's determination that good cause has not been shown for her untimely filing. *Zamot v. Merit Sys. Prot. Bd.*, 332 F.3d 1374, 1377 (Fed. Cir. 2003); *see Mendoza v. Merit Sys. Prot. Bd.*, 966 F.2d 650, 653 (Fed. Cir. 1992) (en banc) ("whether the regulatory time limit for an appeal should be waived based upon a showing of good cause is a matter committed to the Board's discretion"). Board regulations require tardy petitioners to file a "specific and detailed description of the circumstances causing the late filing, accompanied by supporting documentation or other evidence." 5 C.F.R. § 1201.114(f). The Board has held that when petitioners allege delay for medical reasons, they must affirmatively identify medical evidence that addresses the entire period of delay. *Jerusalem v. Dep't of the Air Force*, 107 M.S.P.R. 660, 663, *aff'd*, 280 F. App'x 973 (Fed. Cir. 2008).

Ms. Turman-Kent did not provide the Board with medical evidence that accounted for the entire six-year period of delay at issue in this case. In particular, there was no medical evidence regarding her condition between June 2004 and July 2006. The Board found it probative that Dr. Cavanaugh had not examined Ms. Turman-Kent during the year prior to her husband's death or for a three-year period after his death. Ms. Turman-Kent states that she saw two other physicians during that period when she lived in Georgia, yet no evidence from either of those physicians was presented, nor did Dr. Cavanaugh purport to rely on any such evidence in her evaluation of Ms. Turman-Kent's condition during that period. The dissent refers to a letter written by Ms. Turman-Kent's neurologist in 1988. That letter, which predates the period in question by 16 years, simply ad-

dresses the circumstances giving rise to Ms. Turman-Kent's illness and the fact that she would not be able to continue in her previous profession as an accountant.

We have recognized that the length of delay is an important factor for the Board to consider in determining whether a petitioner has shown good cause for an untimely filing. *Walls v. Merit Sys. Prot. Bd.*, 29 F.3d 1578, 1582 (Fed. Cir. 1994). The length of delay in this case—six years—is exceptional. Even in cases of ongoing illness, the Board has found the absence of medical evidence covering the entirety of a multi-year period to be fatal to a finding of good cause. *See, e.g.*, *Wilson v. Office of Pers. Mgmt.*, 83 M.S.P.R. 223, 227 (1999) (noting that documentation of mental illness from 1988 to 1996 did not excuse absence of medical evidence from period between 1996 and 1999); *Phillips v. Dep't of the Army*, 77 M.S.P.R. 305, 309 (1998) (evidence of "recurrent major depressive disorder" diagnosed in 1995 did not establish petitioner's condition between 1995 and 1997). The Board did not abuse its discretion in demanding a well-documented explanation of the cause for Ms. Turman-Kent's delay in filing her appeal.

Before this court, Ms. Turman-Kent has submitted several pieces of medical evidence that were not presented to the Board. That evidence includes several annual disability certifications issued to her by the Social Security Administration, numerous pharmacy reports of medicines prescribed to her between 2003 and 2011, and an additional letter from Dr. Cavanaugh dated March 2011 that elaborates on Ms. Turman-Kent's condition. Because those items were not presented to the Board, they are not part of the record on appeal and are not properly before us. *See Mueller v. U.S. Postal Serv.*, 76 F.3d 1198, 1201-02 (Fed. Cir. 1996) ("Because we are

limited to reviewing decisions of the Board based on the record before the deciding official, we decline to base our judgment on evidence that was not part of the record before the administrative judge.").

The dissent relies on our decision in *Pyles v. Merit Systems Protection Board*, 45 F.3d 411 (Fed. Cir. 1995). The petitioner in *Pyles* presented the Board with a medical finding that she had "increasingly severe dementia," a "progressive organic brain disease[]" defined by "the loss of intellectual faculties." This court concluded that unrebutted medical evidence of dementia was sufficient to establish good cause for untimely filing. *Id.* at 415. The dissent argues that because brain cell death caused by an intracerebral hemorrhage is permanent, *Pyles* requires the Board to adopt a presumption that Ms. Turman-Kent's cognitive function could not have improved at any point during her six-year delay in filing a petition for review. However, our holding in *Pyles* was predicated not only on the permanence of dementia but also on its very nature as "[a] structurally caused permanent or progressive decline in several dimensions of intellectual function that interferes substantially with the individual's normal social or economic activity." *Id.* The medical literature cited by the dissent does not suggest that cognitive function never improves in persons who have suffered an intracerebral hemorrhage.

Ms. Turman-Kent's motion before the Board states that her illness had temporarily "flare[d] out of control," but that at some later time her condition had "shifted" and "improved" and she "became better able to remember business details, at times." That statement conflicts with Dr. Cavanaugh's assessment of Ms. Turman-Kent's condition as "stable" throughout the six-year period of delay. Moreover, Ms. Turman-Kent timely filed pleadings

before OPM in 2003 and before the Board in 2004. Those filings were made during the multiyear period in which she was not under the care of Dr. Cavanaugh, and they undermine her claim of an ongoing, irreversible medical condition suffered a quarter-century ago that has permanently prevented her from timely filing paperwork in support of her claim. *See Ortiz v. Dep't of Justice*, 103 M.S.P.R. 621, 630 (2006) (finding no good cause for delay due to ongoing illness where evidence did not explain change in circumstances between period in which appellant complied with Board deadlines and period in which he failed to comply); *Choco v. Office of Pers. Mgmt.*, 69 M.S.P.R. 638, 641 (1996) (rejecting appellant's contention that he was precluded from timely filing a petition for review for more than five years, "especially in view of the fact that he was able to file a petition for review with the Board's regional office" four months before his petition for review was due for filing); *Hawkins v. Dep't of the Navy*, 67 M.S.P.R. 559, 562 (1995) (no good cause for eight-month delay in filing petition for review when appellant "was capable of filing a petition for enforcement [of a settlement agreement]" early in that period); *Sing v. Dep't of the Navy*, 51 M.S.P.R. 251, 254 (1991) (finding appellant's allegations of incapacity to file paperwork in a timely fashion undermined by timely filing of other papers during the period in question).[1]

---

[1]    The procedures set forth in this court's decision in *French v. Office of Personnel Management*, 810 F.2d 1118 (Fed. Cir. 1987), for claimants seeking disability retirement benefits are available only upon a showing of incompetence. *See Rapp v. Office of Pers. Mgmt.*, 483 F.3d 1339, 1341 (Fed. Cir. 2007); *Frank v. Office of Pers. Mgmt.*, 111 M.S.P.R. 206, 209 (2009) (same for claimant seeking survivor annuity). In this case, the Board found that Ms. Turman-Kent has not shown that she was incompetent or otherwise incapable of filing a petition for

Ms. Turman-Kent also alleges that she did not receive "proper forms" in a timely manner and was therefore unable to file a timely petition for review. The document that she references is the January 2004 OPM reconsideration decision letter that denied her claim for survivor benefits. Following her receipt of that letter, Ms. Turman-Kent filed a timely appeal with the Board contesting OPM's denial of her claim for benefits. The OPM reconsideration letter is irrelevant to the timeliness of her subsequent petition for review by the full Board of the administrative judge's initial decision, which is the issue before us. Ms. Turman-Kent has never alleged that she did not receive the administrative judge's initial decision informing her of the deadline for submitting a petition for review to the full Board.

Finally, Ms. Turman-Kent states that she was hospitalized for hallucinations and seizures during the period following her return to Illinois. That allegation does not constitute evidence of her condition between June 2004 and July 2006 because she did not return to Illinois until after that time period. Her statement therefore cannot undermine the Board's ruling. Accordingly, we affirm the dismissal of Ms. Turman-Kent's petition for review as untimely.

No costs.

**AFFIRMED**

---

review during the entire period of delay. Therefore, the decision in *French* does not provide an independent ground for reversing the Board's ruling in this case.

# United States Court of Appeals
# for the Federal Circuit

---

**BYRDIE A. TURMAN-KENT,**
*Petitioner,*

**and**

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent.*

---

2011-3100

---

Petition for review of the Merit Systems Protection Board in case No. AT0831040365-I-1.

---

REYNA, *Circuit Judge*, dissenting.

Twenty-five years ago, Ms. Turman-Kent suffered what is commonly known as a "stroke." The cognitive deficits that resulted were devastating for Ms. Turman-Kent, as they are for millions of stroke survivors. She has endured for decades what her doctor describes as a "major disability." Yet the Merit Systems Protection Board ("the Board") dismissed Ms. Turman-Kent's petition as untimely because she did not provide sufficient evidence showing good cause for waiving the filing deadline. The majority opinion ("Maj. Op.") affirms the Board decision, stating that "there was no medical evidence regarding her condition" during what it deemed the critical period in question. Maj. Op. at 4. Because binding case law exists that is directly on point and that requires us to presume

the continuation of a permanent medical condition throughout the entire period of delay, and for other reasons set forth below, I respectfully dissent.

## I. Background

On February 12, 1986, at 34 years old, Petitioner Byrdie Turman-Kent had a stroke. Generally, strokes occur when the brain is deprived of oxygen due to an interruption of blood supply. The stroke Ms. Turman-Kent suffered was secondary to an intracerebral hemorrhage. Intracerebral hemorrhages account for just fifteen percent of all strokes, but they are very serious—victims have a 30-day mortality rate higher than 50 percent and the possibility of long-term disability for those that survive.[1] Intracerebral hemorrhage is caused by a weakened blood vessel that ruptures and bleeds into the surrounding brain tissue. The blood pools and forms a clot, called a hematoma, which as it grows puts pressure on the brain. The area that the ruptured artery formerly supplied is deprived of oxygen-rich blood. Neurological deficits may result. Quoting the National Institutes of Health,

> [s]troke can cause damage to parts of the brain responsible for memory, learning, and awareness. Stroke survivors may have dramatically shortened attention spans or may experience deficits in short-term memory. Individuals also may lose their ability to make plans, comprehend meaning, learn new tasks, or engage in other complex mental activities.

U.S. Dept. of Health and Human Services, National Institutes of Health, National Institute of Neurological

---

[1]    *See* Stedman's Medical Dictionary 1711 (27th ed. 2000); *see infra* n.2.

Disorders and Stroke, Post-Stroke Rehabilitation, NIH Publication No. 11 1846, at 6 (Apr. 2011).[2]

According to one of her treating physicians, Ms. Turman-Kent's intracerebral hemorrhage was a consequence of increased blood pressure, likely brought on by intense work as an accountant.  Ms. Turman-Kent's stroke was so severe as to leave her unconscious and paralyzed on the left side for a time.  She improved initially for two years, but never to where she could return to her job.  Her cognitive deficits have persisted without improvement since 1988.  *See infra* n.4.

Despite these serious health issues, Ms. Turman-Kent married Jesse W. Kent, a former federal employee in June 2001.  At sixty-two, Mr. Kent was older than his new bride at forty-nine years old, but he was the one taking care of Ms. Turman-Kent because of her medical problems.  The following year, the couple moved from Illinois to Georgia.  Just before the move, Ms. Turman-Kent was evaluated by Jean A. Cavanaugh, M.D., a specialist in physical medicine and rehabilitation who first began treating Ms. Turman-Kent shortly after her stroke in 1986 and continues to do so to this day.  Dr. Cavanaugh observed no improvement in her cognitive deficiencies beyond the initial gains of 1986-1988.  This evaluation occurred in 2002, sixteen years after Ms. Turman-Kent suffered her stroke.

When Mr. Kent retired unmarried in 1998, he elected to take a retirement annuity payable only during his

---

[2]    Items capable of accurate and ready determination by resort to unquestionable sources may be given judicial notice. *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 497 n.1 (Fed. Cir. 1997).  I take judicial notice of this government publication and the other medical dictionaries cited throughout this dissenting opinion. *See Pyles v. Merit Sys. Prot. Bd.*, 45 F.3d 411, 415 (Fed. Cir. 1995).

lifetime.  Under the law, employees who were not married when they first retired are permitted to later elect to take a reduction in annuity in order to provide a survivor benefit for a spouse they later married.  Ms. Turman-Kent claims that she and her husband in 2002 made arrangements by phone to change his election to allow for a survivorship reduction in his annuity.

Mr. Kent died on June 2, 2003, and Ms. Turman-Kent sought survivor benefits as his widow.  She was denied on grounds that the government's records did not indicate that a written election of survivor benefits was filed before July 7, 2003, the two-year deadline after the marriage date.  Ms. Turman-Kent requested reconsideration, and by letter of January 22, 2004, was again denied.  That denial letter incorrectly stated that Mr. Kent had passed-away in August, an error that made Ms. Turman-Kent wonder if his file had been mixed up with some else's.[3] The denial of the Office of Personnel Management ("OPM") was affirmed in an AJ's initial decision dated May 17, 2004.  The last page of the AJ's decision stated that the result would become final unless a petition for review was filed before June 21, 2004.

Ms. Turman-Kent, however, did not file prior to June 21, 2004.  She claims that by this point, many months after the death of Mr. Kent, her primary caregiver, life had become very difficult.  Ms. Turman-Kent states that "[t]he stress of trying to forestall foreclosure made my illness flare out of control.  This lead [sic] to increased

---

[3]    This issue, among other issues, could have been fully explored if Ms. Turman-Kent had succeeded in having the initial decision reviewed on the merits.  This dissent deals only with whether Ms. Turman-Kent deserves review of the AJ determination; I express no opinion on the ultimate merits as they are not relevant to the issue of excusable delay.

memory problems which caused a type of regression in my ability to function; especially in the areas of handling business affairs and meeting deadlines." RA18. When she eventually lost her home, Ms. Turman-Kent was forced to return to Illinois with her sister who had been with her in Georgia. Ms. Turman-Kent recollects: "With the loss of my house and my move back to Illinois, paperwork vital to my petition was misplaced and subsequently forgotten because of my memory issues . . . . Trying to make sense of my husband's death, bring his body back to Illinois and deal with my own illness, made life a nightmare for a long time." *Id.*

She was again evaluated by Dr. Cavanaugh upon returning to Illinois in 2006. Dr. Cavanaugh still saw no improvement in the baseline level of Ms. Turman-Kent's impairment; she had, in fact, gotten worse. On top of her already diagnosed inability to function, her seizure medication had become ineffective.

Upon her return to her family in Illinois, the former AJ decision was found. A form "Motion to Accept Filing as Timely and/or to Ask the Board to Waive or Set Aside the Time Limit" was filed with the Board. Ms. Turman-Kent explained under oath why good cause existed, writing that "I have been diagnosed with an intracerebral hemorrhage with hematoma formation. I have both short-term and long-term memory loss." She further explained to the Board that she suffered from "on-going health issues," stating: "I was medically unable to participate in a timely fashion prior to now due to events in 1986, which left me with residual deficits. These deficits are permanent . . . ." RA19; RA28. As proof of their permanence, Ms. Turman-Kent attached an August 31, 2010, letter from her physician, Dr. Cavanaugh, explaining the lasting effects of her stroke after twenty-five years. *See infra* n.4.

## II. Ms. Turman-Kent's Medical Evidence

In a letter contained in the record that expresses medical information and a medical opinion, Ms. Turman-Kent's doctor describes the cognitive deficits experienced by her longtime patient following her stroke. In sum, Dr. Cavanaugh's August 31, 2010 medical opinion specifies that Ms. Turman-Kent suffered an "R frontal intracranial hemorrhage."[4] Dr. Cavanaugh elaborates that from 1988

---

[4]    The text of Dr. Cavanaugh's August 31, 2010 medical opinion before the Board, in its entirety, states:

To Whom It May Concern:

The above named [Byrdie Turman] has been a patient of mine since shortly after her R frontal intracranial hemorrhage in 1986. Her cognitive deficits are her major disability. Her cognition improved for 1-2 years and has been stable but a major impairment since.

I saw her shortly before she left for Atlanta with her husband who took care of her and then again after she and her sister returned in July 2006 and continue to see her.

Her cognitive deficits include decreased initiation of tasks, lose [sic] of train of thought mid task [sic], a decreased problem solving for anything higher than daily events and simple self care.

Because of her cognitive deficits she can not [sic] manage her own medications. This is very apparent on the electronic medical record because I can see what her neurologist and internist have advised. Her sister needs to remind her to take meds. Her sister has been ill and her niece has to take patient grocery shopping. She can not [sic] initiate any activities for pleasure let alone for complex self care. She could not process what she needed for this letter, a friend took the phone and advised me. This has happened with other important paperwork also.

onward, Ms. Turman-Kent's condition became "stable," but her cognitive deficits remained "a major impairment." These cognitive deficits include: "decreased initiation of tasks, lose [sic] train of thought mid task [sic], a decreased problem solving for anything higher than daily events and simple self care." *See supra* n.4. Dr. Cavanaugh noted that Ms. Turman-Kent's "sister needs to remind her to take meds," her niece needs to take her to the grocery store, and a friend had to help Ms. Turman-Kent understand and articulate what was required for her appeal. *Id.* Dr. Cavanaugh concludes that based on these ongoing and irreversible impairments, "There is no doubt in my mind that she was unable to process paper work after her husband's death." *Id.*

### III. The Board Decision

The Board's Final Order of February 11, 2011, however, rejected Dr. Cavanaugh's medical opinion. As the sole basis for its determination, the Board noted that it would not rely on Dr. Cavanaugh's medical opinion for part of the delay period because (1) Dr. Cavanaugh had not seen Ms. Turman-Kent during the time she lived in Atlanta, (2) Dr. Cavanaugh did not indicate that she had reviewed medical files covering their four years apart, and (3) Dr. Cavanaugh's letter post-dates the relevant time

---

There is no doubt in my mind that she was unable to process paper work after her husband's death. He had been the one taking care of her.

I appreciate your consideration in advance. If you need any more information please do not hesitate to contact me[.]

Sincerely
Jean Cavanaugh MD
NorthShore University HealthSystem

RA17.

such that "there is no contemporaneous medical evidence to show the status of appellant's medical condition between June 21, 2004, and August 10, 2010, which is the entire period of delay."  According to the Board, good cause could not be established because the Petitioner had not provided more comprehensive medical records covering two years, from June 2004 to July 2006—the only portion of the delay period that Dr. Cavanaugh was not directly treating Ms. Turman-Kent.  The Board concluded: "[W]e find that the appellant has not submitted sufficient evidence to support that her medical condition impaired her ability to timely file her petition for review, or to request an extension of time," and dismissed.  Ms. Turman-Kent, who has never been represented by counsel in any of these proceedings, appeals to this court *pro se*.

## IV.  Discussion

We affirm a decision of the Board unless it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule, or regulation having been followed; or unsupported by substantial evidence.  5 U.S.C. § 7703(c) (2006).  "The Board necessarily abuses its discretion when it rests its decision on factual findings unsupported by substantial evidence." *Pyles v. Merit Sys. Prot. Bd.*, 45 F.3d 411, 414 (Fed. Cir. 1995).

In my judgment, the Board's determination constitutes an abuse of discretion and is contrary to law for three reasons.  First, Dr. Cavanaugh's medical opinion expressly covered the entire period of delay.  Second, the Board ignored this court's precedent created in *Pyles* such that medical conditions that are permanent will be assumed to continue to exist after the date of diagnosis absent rebuttal evidence of record to the contrary.  *Id.* at 415.  Third, the Board should have remanded for a deter-

mination under *French v. Office of Personnel Management*, 810 F.2d 1118, 1119 (Fed. Cir. 1987), because it is "fundamentally unfair to require or allow an incompetent to act as an advocate" for herself.

### A. The Medical Evidence Expressly Covers the Entire Period of Delay

Both the Board and the majority agreed that "no medical evidence regarding her condition" was presented by Ms. Turman-Kent for the relevant period. Maj. Op. at 4. The record demonstrates that this finding is incorrect. The record contains medical evidence regarding Ms. Turman-Kent's condition during the two-year period cited by the Board and the majority. Dr. Cavanaugh's medical opinion covers the relevant period and more, reciting ongoing "cognitive deficits" that have been a "major disability" for Ms. Turman-Kent since 1988. *See supra* n.4. In particular, Dr. Cavanaugh's unequivocal medical opinion is that Ms. Turman-Kent suffers from brain damage that "made her unable to process paperwork after her husband's death." This conclusion alone established grounds for a good cause waiver spanning from 1988 to 2010, which includes the entire period of delay. *Id.; see Pyles*, 45 F.3d at 415. Hence, the Board's finding that there was no evidence covering the entire period of delay is unsupported by substantial evidence in the record and constitutes an abuse of discretion.

Similarly, the Board's assertion that "there is no indication Dr. Cavanaugh reviewed medical evidence . . . during the time period that appellant was in Atlanta," is also incorrect. Dr. Cavanaugh reported that she reviewed the electronic medical record of Ms. Turman-Kent. *See supra* n.4. The Board did not inquire into whether the electronic medical records contained entries from this period. Dr. Cavanaugh, moreover, confirms that she

examined Ms. Turman-Kent before she left for Atlanta (at sixteen years into the ailment) and after she returned (twenty years into the ailment), finding no change for the better during that period. *Id.* Any inference that Petitioner's chronic condition while briefly in Georgia was improved or qualitatively different from the rest of the twenty-five year history described in the letter is unsupported by substantial evidence. The Board's demand of "contemporaneous" evidence on the basis that Dr. Cavanaugh's letter post-dates the period in question is also erroneous. *See Pyles*, 45 F.3d at 413, 416 ("First, fairly read, Dr. Daniel's unrebutted letter [of November 22, 1993] effectively covers the entire period of delay [ending November 12, 1993].").

## B. The Board Ignored Applicable Precedent

This court has established precedent that addresses the issue of whether a "good cause waiver" can exist notwithstanding potential gaps of medical evidence. This court in *Pyles* held that when a person is diagnosed with a medical condition that is by its nature permanent in severity, the medical condition will be assumed to continue to exist after the date of diagnosis absent rebuttal evidence to the contrary. *Id.* at 415. In *Pyles*, Dr. Daniel treated the petitioner, Ms. Margaret Pyles, for dementia over seven months, from January to July of 1992, but not thereafter. *Id.* at 413. Ms. Pyles filed her untimely appeal on November 12, 1993. *Id.* The AJ rejected a letter from Dr. Daniel, written on November 22, 1993, as incapable of supporting a good cause waiver because Dr. Daniel had not treated Ms. Pyles during the sixteen months immediately prior to filing. *Id.* This court reversed, holding:

> Where, as here, a party is diagnosed with a medical condition that is by its nature 'permanent or

progressive' in severity, it will be assumed to con-
tinue to exist after the date of diagnosis absent
rebuttal evidence of record to the contrary. Thus,
the only finding the AJ could reasonably have
made on this record is that Pyles suffered demen-
tia from January 1992 to the time the appeal was
filed.

*Id. at* 415.

*Pyles* instructs that where a petitioner is diagnosed
with a condition that by its nature is permanent in sever-
ity, and absent related evidence to the contrary, the Board
cannot require additional medical evidence to cover gaps
of medical evidence after diagnosis. *Id.* at 416. As a
matter of law, a petitioner's permanent condition is
assumed to continue unabated absent evidence rebutting
the diagnosis. *Id.* at 415-416; *accord Frank v. Office of
Personnel Mgmt.*, 111 M.S.P.R. 206, 210 (2009) ("Although
the appellant's medical records do not document his
mental condition after 2000 . . . . [w]here a party is diag-
nosed with a medical condition that is by its nature
permanent or progressive in severity, it will be assumed
to continue to exist after the date of diagnosis absent
evidence to the contrary.").

I also read *Pyles* to hold that in order to overcome a
presumption of a permanent medical condition, rebuttal
evidence must be medical evidence:

Because the record contains unrebutted evidence
that Pyles suffered dementia at least through July
1992 and *no medical evidence* whatsoever tending
to show she improved after that time, the AJ's
finding . . . is flatly inconsistent with the very na-
ture of dementia. It is unsupported by substantial
evidence or, indeed, any at all, and the denial of

the waiver based on this unsupported finding was an abuse of discretion.

*Pyles*, 45 F.3d at 415 (emphasis added).

### i. The Board's Failure to Apply *Pyles*

The Board failed to apply the *Pyles* precedent. Indeed, the Board's determination does not mention *Pyles*, or otherwise indicate that any of the *Pyles* criteria were considered. The fact that the Board either overlooked *Pyles*, or ignored it entirely, resulted in a determination that is contrary to law.

It is clear that *Pyles* applies in this case for the following reasons.

First, Ms. Turman-Kent was diagnosed with a medical condition that by its nature is permanent in its severity. The record shows that Ms. Turman-Kent's stroke was brought on by an intracerebral hemorrhage, the worst kind by certain metrics. *See supra* n.1. She was unconscious and paralyzed. She improved initially over two years, regained consciousness and mobility, but the cognitive deficits that resulted from neurological damage remain. She requires assistance to take her medicine and to complete everyday tasks and functions. Her doctor's medical opinion is that her mental impairments prevent her from processing paperwork. Dr. Cavanaugh confirmed that Ms. Turman-Kent's cognitive deficits are a major but stable disability since 1988—i.e., permanent. *See supra* n.4. The record evidence is consistent with medical literature concerning the permanent effects of intracerebral hemorrhage and the limited improvement prospects beyond a couple of years; in particular with regard to the irreversible nature of Ms. Turman-Kent's

cognitive impairments fifteen to twenty-five years post-hemorrhage.[5]

---

[5]   Medical dictionaries and other reliable sources capable of judicial notice indicate that brain damage resulting from a stroke is irreversible.  *See, e.g.*, Stedman's Medical Dictionary 1711 (27th ed. 2000) ("[A] stroke involves irreversible brain damage, the type and severity of symptoms depending on the location and extent of brain tissue whose circulation has been compromised."); Dorland's Illustrated Medical Dictionary 1768 (29th ed. 2000) ("a condition with sudden onset caused by acute vascular lesions of the brain, such as infarction from hemorrhage . . . . is often followed by permanent neurologic damage."); *see also* Black's Medical Dictionary 633 (42d ed. 2010) ("Stroke, or cerebrovascular accident (CVA), is sudden damage to brain tissue . . . The affected brain cells die and the parts of the body they control, or receive sensory messages from, cease to function."); U.S. Dept. of Health and Human Services, National Institutes of Health, National Institute of Neurological Disorders and Stroke, Post-Stroke Rehabilitation, NIH Publication No. 11 1846, at 1 (April 2011) ("Even though rehabilitation does not 'cure' the effects of stroke in that it does not reverse brain damage, rehabilitation can substantially help people achieve the best possible long-term outcome."). Importantly, there is little or no improvement beyond one to two years. *See id.* at 14 ("Researchers found that functional improvements could be seen as late as one year after the stroke, which goes against the conventional wisdom that most recovery is complete by 6 months."); *accord* Robert Teasell, M.D. et al., Evidence-Based Review of Stroke Rehabilitation § 3.3, at 6-8 (13th ed. 2010) ("The course of recovery negatively accelerates as a function of time and is a predictable phenomenon. . . Peak neurological recovery from stroke occurs within the first one to three months. A number of studies have shown that recovery may continue at a slower pace for at least 6 months; with up to 5% of patients continuing to recover for up to one year.") (collecting applicable studies from 1970-2010).

Second, the record does not contain medical evidence that rebuts the severity of an intracerebral hemorrhage and the resulting permanent neurological damage. There is no medical evidence that contradicts that Ms. Turman-Kent suffered an intracerebral hemorrhage, or whether the neurological damage she suffered prevented her from processing paperwork. In sum, the record contains no medical evidence that rebuts the diagnosis of Ms. Turman-Kent's permanent condition persisting after so many years.

Given Ms. Turman-Kent's permanent deficiencies, and absent rebuttal medical evidence to the contrary, the only finding the Board could reasonably have made on the record before it was that Ms. Turman-Kent suffered major cognitive deficits from June 2004 to the time the appeal was filed. The Board's finding that Ms. Turman-Kent failed to establish good cause contravenes this court's ruling in *Pyles* and is therefore contrary to law.

### ii. The Majority Renders *Pyles* Ineffective

The majority believes that *Pyles* does not apply in this case. First, the majority argues that the record shows Ms. Turman-Kent's condition was only temporary, citing Ms. Turman-Kent's personal statements regarding "flare-ups" and noting other "timely filings" before the Board. Maj. Op. at 6. But none of the information relied on by the majority to show a temporary condition is medical evidence.[6] As this court in *Pyles* noted, a finding of a "ten-

---

[6] The AJ in *Pyles* also attempted to rely on non-medical evidence to overcome the doctor's letter there. *Pyles*, 45 F.3d at 414. The AJ in *Pyles* found that appellant's sale of her house, relocation to another state, and her sorting through possessions was "contrary" evidence, stating: "The evidence of the appellant's implied mental incapacity to file an earlier appeal is belied by this evidence reflecting that during the time period for an appeal

dency to improve" absent medical evidence is flatly inconsistent with the very nature of a severe, permanent medical condition. 45 F.3d at 415. There simply is no medical evidence in the record that the cognitive deficits suffered by Ms. Turman-Kent as a result of an intracerebral hemorrhage were temporary in nature. Stated differently, there is no evidence in the record that rebuts Dr. Cavanaugh's opinion that Ms. Turman-Kent's permanent condition made her unable to process paperwork following her husband's death. Because the record is devoid of medical evidence rebutting the diagnosis of a permanent condition, *Pyles* is fully applicable to this case. *See Newell Cos. v. Kenny Mfg. Co.,* 864 F.2d 757, 765 (Fed. Cir. 1988) (stating that "prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc*").

The majority's non-medical evidence is nothing more than a "strained attempt to find in [Ms. Turman-Kent's] submissions a basis for finding her competent to handle her own legal affairs," an approach roundly rejected by the court. *Pyles*, 45 F.3d at 416. That the majority seeks to distinguish *Pyles* by relying on findings not made by the Board amounts to judicial post-hoc rationalization. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) ("The agency must make findings that support its decision, and those findings must be supported by substantial evidence. . . The courts may not accept

_____

the appellant was able to manage her own affairs." *Id*. This court reversed, holding that the evidence cited by the AJ could not rise to the level of rebuttal evidence, that is, evidence sufficient to reasonably overcome the presumption of a permanent medical condition. *Id*. at 415. This non-medical evidence trying to show competence was rejected by the Federal Circuit because there was "no medical evidence whatsoever tending to show she improved . . . ." *Id*.

appellate counsel's *post hoc* rationalizations . . . ."). Our review must be limited to those grounds relied on and articulated by the Board. *See id.*; *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency is alone authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."); *see also In re Hounsfield*, 699 F.2d 1320, 1324 (Fed. Cir. 1983). In order to avoid *Pyles*, the majority adopts findings that go beyond the grounds stated by the Board. This court should not serve to supplement that which the Board lacks in its determination. *Chenery*, 332 U.S. at 196.

The majority rewrites the *Pyles* determination. According to the majority, the presence of a timely filing,[7] a

---

[7] The majority points to other, timely appeals as evidence of only a temporary condition. Maj. Op. at 6. Ms. Pyles, too, made other timely filings before and after her time with Dr. Daniel, but this did not undermine his conclusion of permanence. *See Pyles*, 45 F.3d at 413-14. Taken to its logical extent, the majority's argument that the existence of other, timely appeals undermines one's claim of an irreversible condition would preclude any petitioner gaining relief before this court using *Pyles*, as at least one timely filing would be on record at the Federal Circuit. The majority cites no relevant authority. The *Pyles* court already dismissed *Sing v. Department of the Navy*, 51 M.S.P.R. 251 (1991) as irrelevant in this context because Mr. Sing's "depressive episodes [we]re by definition temporary, treatable, and non-organic," unlike the irreversible condition of Ms. Pyles. 45 F.3d at 416. Similarly, *Ortiz v. Department of Justice*, 103 M.S.P.R. 621, 630 (2006), *Hawkins v. Department of the Navy*, 67 M.S.P.R. 559 (1995), and *Choco v. Office of Personnel Management*, 69 M.S.P.R. 638 (1996), are irrelevant

layman statement by the petitioner,[8] and any purported gap in the record,[9] can defeat the presumption established in *Pyles*. In making these arguments, the majority establishes a new rule of law and overrules *Pyles sub silentio*. Given the majority's reliance on non-medical contrary evidence, petitioners with a permanent condition will be effectively foreclosed from the presumption of *Pyles*. At minimum, the majority should have remanded with instructions that the Board determine whether *Pyles* applies.

### C. *French* Procedure Determination

In *French*, this court instructed the Board to arrange representation for mentally incompetent *pro se* appellants seeking disability retirement benefits. 810 F.2d at 1120.

---

because they are based on merely temporary or undiagnosed conditions. To the degree that any of these Board decisions conflict with our governing law in *Pyles*, they are not binding.

[8] The majority points to Ms. Turman-Kent's statement that her condition "flare[d] out of control" in 2003, but thereafter "improved" somewhat. Maj. Op. at 6. The record in this case shows only that Ms. Turman-Kent's condition sometimes gets appreciably worse, not that her cognitive deficits ever improve beyond the baseline level of impairment diagnosed. To unduly emphasize an isolated, out-of-context statement from a *pro se* appellant over the clear thrust of her entire medical record is contrary to law. *French*, 810 F.2d at 1120 ("It is also unfair that the full board's decision regarding French's disability was based on the incompetent's testimony at the hearing, with its admissions, rather than on medical evidence regarding his sickness and its duration.").

[9] This case is even more compelling than *Pyles* because Ms. Turman-Kent's physician treated her for decades longer; her physician performed another evaluation after their time apart; and her physician's letter explicitly covered the entire period of delay. *Pyles* had none of these. *See Pyles*, 45 F.3d at 413-16.

The court agreed that Mr. French, proceeding *pro se*, had failed to make the requisite showing of mental incompetence to qualify for a waiver, but held that where there is "an apparently nonfrivolous claim of past incompetence by one presently incompetent," the Board must take an "active role" ensuring that the incompetent appellant not alone be "charged with the task of establishing his case." *Id.*

The Board recently extended the fairness principles articulated in *French* to other types of claimants. Specifically, in *Frank v. Office of Personnel Management*, 111 M.S.P.R. 206 (2009), the Board applied *French* to a *pro se* appellant with mental impairment seeking entitlement to survivor annuities under 5 U.S.C. § 8341. *Id.* at 210 ("we discern no reason why the *French* procedures should not be applied here"). In *Frank*, petitioner had failed to produce medical documentation covering the most recent nine years of his illness, so his claim was denied. *Id.* Mr. Frank subsequently filed a petition for review, but did so late. *Id.* at 208 n.2.

Citing *Pyles*, the Board determined that the timeliness requirement was waivable for good cause based on petitioner's past mental incompetence, *id.* at 208 n.2, and remanded for further *French* consideration because,

> Although the appellant's medical records do not document his medical condition after 2000, they nonetheless document a history of chronic mental illness spanning more than 20 years. We find, under the circumstances of this case, that these records are sufficient to call into doubt the appellant's mental competency to prosecute his appeal pro se.

*Id.* at 210. The Board vacated and remanded, allowing new evidence and argument on the appellant's present

mental competence under *French*, and requiring adequate representation if deemed necessary. *Id*. at 211.

Ms. Turman-Kent's documented medical history is just as long as Mr. Frank's, she is entirely *pro se* in seeking her survivor annuity, and the evidence strongly suggests she is currently mentally incompetent. *See supra* n.4 ("she can not [sic] manage her own medications . . . [s]he can not [sic] initiate any activities for pleasure let alone for complex self-care . . . [s]he could not process what she needed for this letter"). As to this last criterion—current mental incompetence—the Board's determination is focused exclusively on the span of time Ms. Turman-Kent was in Georgia. The Board did not otherwise reject Dr. Cavanaugh's opinion regarding incompetence from 2006-2010, when Ms. Turman-Kent was back under her care. In fact, the Board made no findings regarding competence at all, basing its holding strictly on alleged gaps in evidence. Clearly the *French* standard for present mental incompetence could be found in this instance: "An applicant may be one having some minimal capacity to manage his own affairs, and not needing to be committed. The claimant is not required to have been a raving lunatic continuously." *Frank*, 111 M.S.P.R. at 210 (internal quotation marks omitted). Accordingly, Ms. Turman-Kent should also have benefited from the overarching fairness principles of *French*, as extended by *Frank*. Here, too, it was:

> "patently unreasonable and fundamentally unfair to require or allow an incompetent to act as an advocate" for h[er]self in a situation in which [s]he "was required to establish or allowed to attempt to show h[er] own incompetency for many years in the past."

*Id.* (quoting *French*, 810 F.2d at 1119).  I find that this case should have been remanded with instruction to the Board to make a *French* determination.

## V.  Conclusion

In good cause determinations "broad equitable principles of justice and good conscience" must be applied and "any doubt about whether good cause has been shown should be resolved in favor of an appellant."  *Alonzo v. Dep't of the Air Force*, 4 M.S.P.R. 180, 184, 186 (1980). This principle has disappeared from the Board's analysis. The case law requires no more than a "reasonable excuse," *id.* at 184, which Ms. Turman-Kent undoubtedly presented.  I would have reversed and remanded for the reasons stated above, and therefore I dissent.